UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| STEPHEN BURTON LOCKHART, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | ) Civil No. 9-497-B-W |
| | ) |
| WARDEN, | ) |
| MAINE STATE PRISON,[1] | ) |
| | ) |
| Respondent | ) |

**RECOMMENDED DECISION ON 28 U.S.C. 2254 MOTION**

Stephen Lockhart is serving a forty-seven-year sentence after he was convicted by a

Maine jury for murdering his estranged wife, Andrea Lockhart.  Lockhart does not contest that

he caused Andrea's death; his theory is that he should have only been convicted on the lesser

offense of manslaughter.  Lockhart has filed this timely 28 U.S.C. § 2254 petition that presses

five Sixth Amendment ineffective assistance of counsel grounds.  Lockhart was represented by

three attorneys during his prosecution -- one attorney withdrew before trial and was replaced, so

Lockhart had two attorneys at trial.[2]  The State of Maine has answered the petition, describing all

five grounds as fully exhausted for purposes of 28 U.S.C. § 2254(b)(1)(A).[3]  After a thorough

review of the extensive trial and post-conviction record, I recommend that the Court deny

Lockhart § 2254 relief for the reasons that follows.

---

[1]        This case is captioned in accordance with how Lockhart listed the respondent in his 28 U.S.C. § 2254 petition and the clerks office's docketing thereof.   This has long been the practice in this district.  The proper respondent for petitions such as this is the custodian of prisoner: the current warden of the Maine State prison. Lockhart did name Jeffrey Merrill as the warden; Patricia Barnhart is the current warden of this facility.

[2]        In this opinion I refer for the most part to Lockhart's attorneys generically as 'defense counsel.'

[3]        In his reply memorandum, Lockhart concedes: "The State's account of the procedural background with supporting documents appear to be correct for the most part."  (Reply Mem. at 1.) There is one dispute that touches upon exhaustion which is whether or not Lockhart adequately presented a factual facet of his fifth ground to the state courts.  I address this dispute in the discussion of that fifth ground below.

*Discussion*

## I.     Factual Background on the Crime

The Maine Supreme Court summarized the historical facts of Lockhart's frayed marital

relationship, the lethal confrontation, and his initial confession as follows:

> Andrea and Stephen Lockhart married in 1991 and had three children. On April 18, 1997, Andrea sought medical help at a hospital twelve hours after receiving a laceration above her left eyelid. She told the emergency room physician assistant on duty that her husband kicked in the front door the previous night and that the door struck her face. Andrea and Lockhart separated in September 1998. Andrea and the children moved into a home in Lamoine, and Lockhart moved into a rented apartment above the workshop of his employer, a boatyard in Southwest Harbor.
>
> On Friday, December 11, 1998, Andrea called Lockhart at the boatyard to see if he could take care of their oldest child, who was sick, because Andrea was scheduled to work that evening, and Lockhart agreed. Around 3:45 p.m., Andrea arrived at the boatyard with the sick child and settled him into the apartment. Lockhart accompanied Andrea downstairs and into the boatyard workshop. There, they got into a heated argument about the children's Christmas Day plans, the Department of Human Services' recent involvement in the collection of child support payments from Lockhart, and the role of Andrea's new boyfriend in her and the children's lives.[4]
>
> The argument escalated into a physical altercation during which Lockhart attempted to strangle Andrea by grabbing her neck with both of his hands. He then struck her with a twenty-one-inch-long wedge-shaped block of wood, knocking her to the concrete floor. While she lay on the floor, Lockhart hit Andrea on top of the head with the block of wood, causing multiple skull fractures and brain hemorrhage. The medical examiner subsequently determined that while the strangulation and the blow to the top of Andrea's head each could have been fatal, Andrea died from the blunt impact head injury, with the injuries from strangulation being a contributing factor.
>
> Lockhart wrapped Andrea's bleeding head with duct tape, put the body into Andrea's van, and drove the van to the last bay in the workshop. He prepared a seven-foot-long box by fiberglassing the sides and bottom, moved the body out of the van and placed it in the box,[5] and sealed the top of the box with more fiberglass. Lockhart returned upstairs to the apartment and made supper for his son.
>
> When Andrea failed to show up at work, Andrea's sister and boyfriend each called the police twice. Officer Murphy was dispatched from the Southwest Harbor Police Station to the boatyard several times to look for Andrea and her

---

[4]     This is based on Lockhart's own testimony as no one else heard or witnessed the argument.

[5]     Prior to sealing the box Lockhart mixed a combination of chemicals on hand to partially cover the body with foam.

silver van. When he drove around the boatyard, he did not see a woman or a silver van. Andrea's sister and her husband also stopped by Lockhart's apartment to ask about Andrea's whereabouts. Lockhart calmly responded that Andrea had only been at the boatyard long enough to drop off the sick child, and the sister said that she intended to inform the police that Andrea was missing.

After his visitors left and the child fell asleep, Lockhart ran and walked the two miles to the police station. When Officer Murphy approached Lockhart around 9:45 p.m. in the station, Lockhart cried out, "I killed her, I killed her, I killed her." Officer Murphy asked Lockhart to come into the officers' room and sit down. Officer Murphy asked, "Are you Stephen Lockhart?" Lockhart said that he was, and Officer Murphy asked, "Where is Andrea?" Lockhart responded that she was at the boatyard. Officer Murphy then told Lockhart he needed to know exactly where she was because she may need help and asked him exactly where Andrea was. Lockhart responded that she was in the last bay with her van. During the twenty minutes that Officer Murphy was with Lockhart, Lockhart was alternating between "uncontrollably shaking and screaming" and "just sobbing."

State v. Lockhart, 2003 ME 108, ¶¶ 2-7, 830 A.2d 433, 438-39.

## II. Parameters of 28 U.S.C. § 2254 Review and the Sixth Amendment Standard

This Court will not grant a petition for habeas relief "with respect to any claim that was adjudicated on the merits in State court proceedings" unless the Maine court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1), (2). The Maine courts' factual findings "shall be presumed to be correct" and Lockhart bears the burden of disproving these factual findings by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1). See also O'Laughlin v. O'Brien, 568 F.3d 287, 298 (1st Cir.2009); McCambridge v. Hall, 303 F.3d 24, 34-35 (1st Cir.2002).  With respect to the factual findings, Lockhart had five days of hearing in the post-conviction court on his ineffective assistance of counsel claims.

"To prevail," on his Sixth Amendment claims premised on the Strickland v. Washington, 466 U.S. 668 (1984) standard, Lockhart "must show both that 'counsel's representation fell

below an objective standard of reasonableness,' <u>Strickland</u>, 466 U.S., at 688, and that there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different,' <u>id.</u>, at 694." <u>Smith v. Spisak</u>, __ U.S. __, __, 130 S. Ct. 676, 685 (2010). Although Lockhart "must prove both deficient performance and prejudice to prevail on his ineffective assistance of counsel claim, a reviewing court need not address both requirements if the evidence as to either is lacking. As the Supreme Court has recognized, '[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.'" <u>Sleeper v. Spencer</u>, 510 F.3d 32, 39 (1st Cir. 2007) (quoting <u>Strickland</u>, 466 U.S. at 697).

With respect to the identification of the governing United States Supreme Court precedent, the post-conviction court recognized <u>McGowan v. State</u>, 2006 ME 16, PP 11-12, 894 A.2d 493, 496-97, as setting forth the two prongs of ineffective assistance of counsel inquiry, and expressly referenced <u>Strickland</u> as to the prejudice prong. (Post-Conviction Order at 2.) <u>McGowan</u> relied heavily on <u>Strickland</u>. Therefore, there is no question that the state court identified Lockhart's federal constitutional claim and that its decision is entitled to "AEDPA's heightened deference." <u>Clements v. Clarke</u>, 530 F.3d 45,54 (1st Cir. Jan. 2010); <u>see also</u> <u>Gray v. Brady</u>, __ F.3d __, __, 2010 WL 256324, 4 -5 (1st Cir. Jan. 25, 2010).

**II.    Lockhart's Ineffective Assistance of Counsel Claims**

This is a recommendation on a 28 U.S.C. § 2254 petition vis-à-vis which I think it is important to add the following preface. Justice did not get short-shrift here. The transcripts of the trial and the sentencing – without reference to the subsequent explanations of counsel at the post-conviction hearing – attest to the fact that this was a dramatic and onerous case for defense counsel. It is also evident at this stage of review that defense counsel and the presiding justice

worked conscientiously to assure that Lockhart had a full opportunity to present his position that this was a crime lacking in the necessary mens rea for intentional murder.  While there were a significant number of sidebars and conferences outside the hearing of the jury, I would add that many of these were at the behest of the defense and, from an unbiased reading of the trial and sentencing proceedings, the prosecution was restrained and did not overstep in attempting to secure a conviction on the intentional murder charge.  This is not the type of reflection that I usually make in reviewing § 2254 claims but in this instance not much is left to inference with respect to the decisions made by the defense, the prosecution, and the superior court justice who presided over the trial, the sentencing, and the post-conviction proceedings.  See cf. United States v. McGill, 11 F.3d 223, 225 (1st Cir. 1993) ("Moreover, when, as in this case, a petition for federal habeas relief is presented to the judge who presided at the petitioner's trial, the judge is at liberty to employ the knowledge gleaned during previous proceedings and make findings based thereon without convening an additional hearing.").

### A.   Failure to Present Psychiatric Experts During Trial and Sentencing

Lockhart's first 28 U.S.C. § 2254 challenge to his attorney's performance pertains to a decision not to present a psychiatric expert at trial or during sentencing.[6]  The post-conviction court addressed this attack on counsel at some length. (Post-Conviction Order at 3-18, 20-23.)

With regards to the effectiveness prong, the post-conviction court found in Lockhart's favor:

> In this instance, however, based on Lockhart's considerable history of substance abuse, resulting in a nine day stay in Acadia Hospital less than a month before the homicide, Lockhart's concurrent treatment for depression, Lockhart's anguished behavior at the police station on December 22, 1998, the seriousness of the charges, counsel's initial recognition that a psychological evaluation would be useful …, and especially given that counsel told Lockhart that such an evaluation

---

[6]     Judging by the proportionate length of his briefing on this ground – 61 of the 123 pages – this is Lockhart's most ardent § 2254 attack on the judgment of the post-conviction court.

would be pursued, the court concludes that it was ineffective not to follow
through.

(Post-conviction Order at 12.)

Accordingly the 28 U.S.C. § 2254 inquiry turns on the <u>Strickland</u> prejudice prong.   The

post-conviction court reasoned apropos the trial outcome:

> The crucial question with respect to this issue is whether the failure to
> obtain a psychological evaluation would have had a reasonable probability of
> leading to a different result at trial.  On this issue the court finds that petitioner
> has not met his burden of proof for a number of reasons.

(Post-conviction Order at 12.)   The post-conviction justice noted, among other things, that it did

not find (as the judge also presiding over the trial), "that Dr. Robinson's opinion as to Lockhart's

intent would have been admissible at trial even if that opinion had been available to trial

counsel." (<u>Id.</u> at 13.)  The justice, in his post-conviction shoes, noted that the question of

"whether Lockhart caused Andrea's death intentionally and knowingly is an ultimate issue for

the jury, and the Law Court has firmly excluded expert opinions from psychologists on that

issue." (<u>Id.</u> at 13.)  The court further observed that such testimony involves credibility

determinations by the expert, the type of credibility determination that should be left to the jury.

(<u>Id.</u> at 14.)  "For instance," the court explained:

> Although the court does not recall that Dr. Robinson ever expressly stated
> that he had found Lockhart's version of events to be credible, he in fact relied,
> among other things, on Lockhart's recent report that his sleep was disturbed, on
> Lockhart's recitation of the conversation between Lockhart and Andrea
> immediately before her death, and Lockhart's reports that Andrea had often
> engaged in physical aggression towards him. … These facts were either
> unverifiable from any other source or were disputed, yet for Dr. Robinson to offer
> opinions based on Lockhart's statements would have communicated to the jury
> that an expert psychologist found Lockhart to be credible.  Lay witnesses are not
> ordinarily entitled to express views on credibility of other witnesses, <u>see</u>, <u>e.g.</u>,
> <u>State v. Dube</u>, 598 A.2d 742, 745-46 (Me. 1991), and expert psychologists have
> no greater leeway to offer direct or indirect assessments of credibility.
> Determining the credibility of witnesses is within the exclusive province of the
> jury.  <u>State v. Crocker</u>, 435 A.2d 58, 77 (Me. 1981).

(Id. at 14-15.)

     The post-conviction court also addressed the implications of this testimony vis-à-vis the fact that Lockhart was on an anti-depressant medication called Effexor XR.  In his recitation of background facts, the judge explained that the attorney who followed-up on this question before trial looked the medication up in the Physician Desk Reference or on the internet and had spoken to a doctor.  This attorney did not remember "exactly what he learned but recalled that nothing he learned had attracted his attention to cause him to pursue Effexor as an issue."  (Id. at 7-8.) Dr. Robinson's report used at the post-conviction hearing was that "there were possible untoward violent side effects from serotonin inhibitors such as Effexor and noted that an examination by a psychiatrist would be necessary to explore this issue."  (Id. at 9.)   However, Dr. Voss's report, tendered as part of the post-conviction proceedings, concluded that "assessing whether Lockhart's behavioral controls were adversely affected by Effexor, 'at this point is essentially impossible.'"  (Id. at 10) (record citation omitted).   "At the hearing," the post-conviction court explained, "Dr. Voss went beyond his report to state that he thought there was a significant chance that Lockhart's behavioral controls had been affected by Effexor."  (Id. at 11.)

     With respect to his Sixth Amendment prejudice analysis and the trial phase, the post-conviction judge reasoned:

> [E]ven if Dr. Voss's opinion that it is possible that Lockhart's behavioral controls were adversely effected by Effexor XR – although whether this was true was impossible to assess at this time – was largely if not entirely  based on Lockhart's self reporting more than eight years after he caused Andrea's death.  Specifically, Dr. Voss based his opinion on nightmares and sleep deprivation reported by Lockhart when he was interviewed in 2007 and on Lockhart's version of events surrounding Andrea's death.  Lockhart's 2007 report of nightmares and sleep deprivation was the first these possible side effects had ever been mentioned and was completely at odds with the evidence of well being that Lockhart had offered at trial.  See,  e.g., Trial Tr. at 235-36, 746-47, 816-17.  It was also inconsistent with what Lockhart had told his trial counsel, which was that he was doing the

best he had ever done during the time period immediately prior to Andrea's death.
…

       Moreover, even assuming that Dr. Voss could have testified that  -- if Lockhart's recent self-reports were true – it is possible that his behavioral controls were affected by Effexor, that testimony would have not been likely to have affected the outcome of the case because Lockhart's recent self-reports were not credible.  It bears emphasis that the only objective evidence of possible side effects in the record was Lockhart's weight loss – and the Acadia records demonstrate that most if not all that weight loss had occurred <u>prior</u> to his inpatient detox from November 5 to 14.  …This was before Lockhart began taking Effexor regularly.

(<u>Id.</u> at 15-16.)

The court further noted:

       [A]n opinion that Lockhart's "behavioral controls could have been adversely affected by Effexor"  is not the same as saying that Effexor could have deprived Lockhart of the requisite intentional and knowing state of mind. Behavioral controls are adversely affected by multiple factors – including anger, lack of sleep, and unrelated stressors.  None of those factors affect whether a person's behavior is intentional or knowing for purposes of criminal culpability.
       In the final analysis, any admissible psychological and psychiatric testimony that could have been offered would not have had a reasonable probability of changing the outcome of the trial given the other evidence in the record.  This included the following:  That at a time when he was not taking Effexor Lockhart had choked Andrea and left bruises on her neck in the Halloween incident, that he had stated some months before December 11 that if Andrea ever went to DHS, he'd kill her, that he had called Vaughn Nichols (Andrea's new boyfriend) and stated that if Nichols was not having sex with Andrea "you'd better start fucking her because you won't be fucking her long," Trial Tr. at 166, and particularly given the evidence at trial as to the events of December 11 itself.  In particular, there was evidence that Andrea had been strangled (petechial hemorrhages under her eyelids and a fracture of her hyoid bone)  which Lockhart never adequately explained, that he had hit Andrea with a board hard enough in the mouth to break her teeth, and that after Andrea had fallen down, he had swung the board at her head hard enough to fracture her skull. (<u>See</u> Trial Tr. at 942-46, 946-50.  Lockhart's demonstration to the jury during cross-examination of how he swung the board once Andrea was on the ground, Trial Tr. at 943-44, was probably alone enough to eliminate any reasonable doubt that his actions were intentional and knowing.

(Id. at 17-18.)  This final observation by the trial judge cum post-conviction justice sends a strong message to this court with respect to the overall brunt of the evidence and it is a first-hand observation that is amply supported by reading the transcripts of the criminal proceedings.

The post-conviction court also noted that Doctors Robinson and Vose partially pinned their opinions to their view that the killing was out of character, but the State had offered "considerable evidence at trial that the death of Andrea Lockhart was the culmination of a pattern of violence inflicted by Stephen Lockhart upon his wife – involving, most notably, the Halloween choking incident that had occurred before Lockhart began taking Effexor."  (Id. at 16.)  The court further emphasized that Voss acknowledged that violence tends to escalate when a victim of domestic violence attempts to make the final break.  (Id.)

As for this potential evidence and sentencing, the post-conviction judge observed that he had ordered a forensic evaluation of Lockhart after trial and he reviewed the resulting report of Dr. Yonkovitz before sentencing.  (Id. at 20.)   "This report outlined Lockhart's prior inpatient admission for substance abuse, his diagnosis of major depression and his two reported suicide attempts."  (Id. at 20-21.)   The judge noted that given his access to this report conducted by the State Forensic Services (and not at the behest of the prosecution) he would not find counsel ineffective for not ordering an additional evaluation.  (Id. at 21.)   The post-conviction/ sentencing judge concluded that the opinions of Dr. Robinson and Dr. Voss would not "have had a reasonable probability of affecting Lockhart's sentence," explaining:

> First, in light of the jury verdict of murder, which was strongly supported by the evidence at trial, the court's sentence would not have been affected by Dr. Robinson's opinion that there was a strong likelihood that Lockhart's actions had been reckless rather than intentional.  While this court does not disagree with Dr. Robinson's view that Lockhart lost control on December 11, 1998, Lockhart's testimony at trial demonstrated that he had lost control from anger and rage – which is not inconsistent with his having formed the intent to kill Andrea or with his having been aware that it was practically certain his conduct (strangling

9

Andrea and swinging the board at her head once she was on the ground) would cause Andrea's death.

A closer case is presented by Dr. Voss's testimony that Lockhart's behavioral controls could have been adversely affected by the Effexor he was taking. While this testimony did not mean that Lockhart's actions were not intentional or knowing, it could have led to a finding that Effexor could have lowered Lockhart's inhibitions and made him more susceptible to acting on his impulses. If the court had credited that Lockhart was in fact experiencing aggression and hostility as a side effect of Effexor, this would have been a mitigating factor to some degree at sentencing. See Sentencing Tr. 103 (observation that Lockhart was not under the influence of any substance at the time in question).

However, the court ultimately does not find that there is a reasonable probability that Lockhart's sentence would have changed. First, as noted above, the court does not conclude that Lockhart was actually experiencing side effects from Effexor….Lockhart did not contemporaneously report anxiety, vivid nightmares, or disturbed sleep – quite the contrary. He also did not report anything even remotely resembling his 2007 statement to Dr. Voss that upon waking he sometimes felt like he was coming off a cocaine binge. Voss Testimony a 101.

Moreover, to the extent that it could be argued that Lockhart's anger at Andrea at the time he killed was a symptom of Effexor-induced aggressiveness and hostility, the problem is that Lockhart has consistently demonstrated similar urges and behavior long before he was taking Effexor – for instance, when he kicked a door into Andrea's head, when he tried to choke her on Halloween, when he made a chilling threat to Vaughn Nichols, when (as he admitted) he frequently used to grab Andrea's jaw very hard in order to shut her up, when he threw a kid's bicycle through a window inches from her head. Indeed, Lockhart's anger was also much on display after Andrea's death when he wrote angry letters to the newspaper and to witnesses and when, after beginning his statement at sentencing with notable remorse, he verged off into criticism of the prosecutor, Detective Pickering, certain of the witnesses who had testified at trial, and Andrea.

The court does not conclude, therefore, that any failure of counsel to offer expert psychological or psychiatric testimony at sentencing would likely have resulted in a lower sentence.

(Id. at 22-23.)

Given the extent of careful consideration given to this combined ground by the post-conviction court, not much needs to be said when looking at this ground through the 28 U.S.C. § 2254 review prism. The superior court justice made several key factual conclusions about the temporal import of this evidence as it related to counsel's performance and the potential

prejudice. There is nothing presented in Lockhart's extensive § 2254 pleading that even begins to meet his burden of rebutting these conclusions. The application of the <u>Strickland</u> standard to this record apropos this dual-layered challenge certainly survives § 2254 scrutiny under the prejudice prong.

### B. *Waiving Affirmative Defense of Adequate Provocation Manslaughter*

Lockhart's next discontent with his attorney is that counsel waived Lockhart's affirmative defense of adequate provocation manslaughter. Lockhart did present a challenge to the absence of a jury instruction on adequate provocation in his direct appeal to the Maine Law Court. The Law Court summarized and concluded:

Lockhart contends that although defense counsel did not seek an instruction as to the affirmative defense of adequate provocation, it was obvious error for the court to fail to sua sponte give such an instruction because adequate provocation was a reasonable hypothesis for the jury to consider. Lockhart states that there was ample evidence in the record to support a jury conclusion that his actions were taken under the influence of extreme anger brought on by adequate provocation. The State responds that because Lockhart waived the instruction and did not establish the affirmative defense of adequate provocation beyond a preponderance of the evidence, he is barred from raising the issue on appeal.

"It is an affirmative defense to a prosecution under [the murder subsection] that the person causes the death while under the influence of extreme anger or extreme fear brought about by adequate provocation." 17-A M.R.S.A. § 201(3) (Supp.2002). Section 201(4) provides that:

[P]rovocation is adequate if:
A. It is not induced by the person; and
B. It is reasonable for the person to react to the provocation with extreme anger or extreme fear, provided that evidence demonstrating only that the person has a tendency towards extreme anger or extreme fear is not sufficient, in and of itself, to establish the reasonableness of the person's reaction.

17-A M.R.S.A. § 201(4) (Supp.2002); <u>see also</u> <u>State v. Haque</u>, 1999 ME 30, ¶¶ 19-20, 726 A.2d 205, 209 (listing the following examples of conduct as being insufficient to give rise to the defense of adequate provocation: the hearing of mere words regardless of how hurtful or inflammatory, the finding of a note that suggests an ex-spouse is in a new relationship, or the discovery of an ex-spouse slow dancing with someone else).

The court stated that it understood that Lockhart was not requesting a jury instruction on the affirmative defense of adequate provocation. Defense counsel

agreed, consulted with his client, and informed the court that they indeed did waive the instruction as to adequate provocation. Because Lockhart affirmatively waived an instruction on the affirmative defense of adequate provocation, our review is limited to obvious error. See 17-A M.R.S.A. § 101(1) (Supp.2002). Even if Lockhart had not affirmatively waived this issue, the issue is not generated by the trial evidence because Lockhart's testimony about the heated argument, slapping, and hitting is insufficient to establish that the provocation was adequate. First, Lockhart failed to produce evidence demonstrating that he did not induce the provocation. Second, he did not demonstrate that it was reasonable for him to react to Andrea's conduct with extreme anger. The trial court did not commit error, and certainly not obvious error, when it did not instruct the jury regarding the affirmative defense of adequate provocation.

Id., 2003 ME 108, ¶¶ 40-42, 830 A.2d at 447-48 (emphasis added).

The post-conviction court revisited the prospect of such an instruction in the context of an ineffective assistance claim.  Observing that this ground implicated the arguments made vis-à-vis the psychological and psychiatric testimony, the post-conviction court explained: "Petitioner's thesis is that if psychological testimony had been offered, petitioner would have been entitled to an instruction on adequate provocation."  (Post-conviction Order at 18.)

First observing that the Law Court has already concluded that the issue of adequate provocation was not generated by the evidence in view of Lockhart's own testimony, (id. at 18-19), the post-conviction justice reflected, "the court does not find that psychological testimony – particularly given its admissibility problems – could have applied the missing ingredients" (id. at 19).  He then expanded:

Lockhart is essentially arguing on post conviction that, because of his particular psychological makeup and the 'possible' effects of Effexor, he was more susceptible to provocation than someone else would have been in the same situation.  Carried to its logical extension, however, this argument would suggest that the court and the jury would have to consider adequate provocation on a sliding scale depending on the particular vulnerabilities of each defendant  -- that for some defendants mere words might be enough as long as those words were especially provocative to that individual.   This is not in accord with Maine law. Mere words are not enough, however those words might affect a particular individual.  Haque, 1999 ME 30 ¶¶19-20, 726 A.2d at 209.  Instead there is an objective standard for whether events or conduct constitute adequate provocation

as a matter of law, see id., and the Law Court has already found that the
interchange between Stephen and Andrea Lockhart immediately prior to Andrea's
death did not meet that standard.

In addition, the decision not to press for an adequate provocation defense
stemmed in part from trial counsel's view that such a defense was inconsistent
with Lockhart's testimony  (a change from "I didn't intend to kill" to "I killed her
because she provoked me") and would have opened the defense to the charge that
it was blaming the victim – something trial counsel wanted to avoid at all cost.
Post conviction counsel implicitly faults this strategy.  However, different lawyers
try cases differently, and court must avoid assessing counsel's effectiveness based
on hindsight.  ….

Finally, the court does not credit Lockhart's testimony that he was told
that the adequate provocation issue would not be pursued by the defense only
seconds before it was waived on the record.  That may be the way Lockhart now
remembers it, but the colloquy on the record demonstrates that the issue had been
discussed by counsel and the court before the parties went on the record and that
the court had already been told of the defense intention to waive the adequate
provocation instruction.  See Trial Tr. 990-91.  The court concludes that Lockhart
had been consulted as to that decision before the parties went on the record on
October 9, 2001.

(Id. at 19-20) (footnote and some internal citations omitted).

The post-conviction court's conclusion that defense counsel made a strategic choice to

forgo the adequate provocation instruction in the hopes of shoring up/ not undermining the

theory of the lack of intent is not an unreasonable application of Strickland.  That is the most

important element of the court's analysis for purposes of this court's 28 U.S.C. § 2254 review

but it is also important to reiterate that in Maine "there is an objective standard for whether

events or conduct constitute adequate provocation as a matter of law" and "the Law Court has

already found that the interchange between Stephen and Andrea Lockhart immediately prior to

Andrea's death did not meet that standard."

### C.  Failure to Properly Investigate and Prepare

Lockhart's third 28 U.S.C. § 2254 challenge to trial counsel's performance concerns pre-

trial investigation and preparation.   In his counseled amended state petition for post-conviction

review Lockhart challenged his attorneys' performance on the grounds that counsel did not

13

adequately investigate the case or retain a professional to "investigate and assist in the preparation of this very complex and serious matter." (Am. Pet. Post-conviction Review at 4.) He articulated the Sixth Amendment deprivation as being the impediment to his ability to challenge the testimony of prosecution witnesses and the prevention of his presentation of evidence concerning the relationship between Lockhart and Andrea that would have rebutted the prosecution's theory of the case. (Id.) In his 28 U.S.C. § 2254 memorandum Lockhart breaks this ground into two fronts: (1) not calling Monte Somers, and (2), not calling Bruce Clukey. The State maintains that this ground is exhausted and fully addressed by the post-conviction court, citing a lengthy footnote and a paragraph in the post-conviction court's order addressing "other grounds."

### Monte Somers

In his eighteen-page discussion of this 28 U.S.C. § 2254 ground Lockhart focuses primarily on the approach to the testimony of Maine Coast Memorial Hospital Technician Monte Somers and Detective Pickering concerning Pickering's report of statements made by Lockhart after a CAT scan was performed on December 12, 1998. Lockhart explains that at trial Pickering "stated that after the petitioner awoke from the Cat Scan they [were] walking up a long hallway, the two were engaged in a conversation when Somers began talking of his engagement, he (allegedly) said it was surprising because he 'hates all women.' Pickering made a claim that when this was said, the petitioner looked at him, smiled, and said, 'I guess he doesn't know what I'm here for.'" (Sec. 2255 Mem. at 88.)

In the context of § 2254 review, the trial transcript does demonstrate that counsel addressed this concern during his cross-examination of Detective Pickering. The prosecutor broached this conversation on direct, and Pickering testified:

> The CAT scan procedure takes awhile, and rather than just sitting and staring at each other, we talked about people we knew and mutual friends and relationships, and he was talking about his fiancé … and we were talking about her, how they are doing, and he explained to me while we were talking about his previous relationship.  About this time the CAT scan is over, Steve Lockhart is coming out of the CAT scan and we were walking back to the emergency room area, and at the Maine Coast Memorial Hospital, it's a large building and the CAT scan is a long distance from the emergency room, so we were walking up a long corridor and Monte and I continued on with our conversation, Monte was to my left, Steve was just behind me a little bit and to my left, And Monte said to me, he says I can't believe that – when I said his fiancé, he said at that time I hate all women and I couldn't believe we got along so well.  Steve looked at me and smiled and said he doesn't know what I'm here for.

(Trial Tr. at 694-95.) Defense counsel pursued Pickering on this testimony during cross-examination, bringing home the fact that Pickering – who was trained and experienced in taking detailed notes for his reports on an investigation (see id. at 720- 22) – did not put this statement allegedly made by Lockhart in response to the Monte discussion in his report concerning this part of the investigation. The cross-examination went in part:

> Q. …So on the in hospital page, nowhere does this statement that was allegedly made in response to something Monte Somers says appear; is that correct?
> A.      Yes.
> Q.      Every one of those five entries appears in your continuation report in quotes, correct.
> A.      Correct.  I would have to check, but I believe so.
> Q.      But this statement of [] Lockhart responding to Mr. Somers does not appear in your notes but appears in your continuation report in quotes?
> A.      Correct.
> Q.      So you would have had to remember that statement for some period of time when those notes get transcribed to get that into your continuation report in quotes?
> A.      30 days at the very most. At the very most 30 days, and it was less than that.

(Id. at 734-35.)

> Apropos this attack, the post-conviction court reasoned:

> Lockhart contends on post-conviction that trial counsel were ineffective in rebutting Pickering's testimony as to statements Lockhart made at the hospital to Monte Somers.  He makes this complaint even though, at sentencing, he

>complimented [trial counsel] for demonstrating that Pickering's testimony on that issue was not credible.  Sentencing Tr. 68.  Although Lockhart now suggests that Somers should have been called as a witness at trial, the affidavit obtained from Somers by Lockhart's post conviction counsel only states that Somers now does not remember the smile and statement referred to by Pickering, not that those events did not occur.

(Post-conviction Order at 29.)

Although I am not sure that Lockhart's own praise of counsel apropos the Pickering cross-examination, alone, is enough to defeat Lockhart's <u>Strickland</u> performance clause showing, it is evident from the cross-examination that counsel performed well within the Sixth Amendment representation scope in challenging Pickering's report as it related to this alleged interchange.  Furthermore, as the post-conviction court pointed out, there is a significant shortfall in Lockhart's post-conviction showing of prejudice as the affidavit demonstrates that Somers's testimony would have added little to the defense's attack on this evidence.  Indeed, one could as easily say that it was better to leave the question of Pickering's selective approach to report writing dangling than to have Somers come in for the sole purpose of stating a lack of recollection.

### Bruce Clukey

Bruce Clukey worked for the Department of Human Services (DHS) during the times relevant to Lockhart's case and, roughly put,  had some responsibility for monitoring and adjusting Lockhart's child support obligations.  It is Lockhart's belief that Clukey was a valuable witness towards discrediting the testimony of Lewis Moore, an employer of Lockhart's and someone who was working with Lockhart on a joint business venture.  (<u>See</u> Sec. 2254 Mem. at 1, Doc. No. 1-2 at 1.)

Of importance to the tenability of calling Clukey as a witness, Lewis Moore testified on direct:

16

Q.      Were you involved in withholding child support payments for [Lockhart] with regards to a prior relationship?

A.      Yes, ma'am, I was.

Q.      And did that lead to a conversation with the defendant about child support for Brent and Maria and Sally?

A.      Yes, I'm not sure that that in particular led to that conversation, but it did take place.  And about two weeks before the conversation had taken place, I had just been in touch with the Department of Human Services on Stephen's behalf to try to get a reduction in …the rate of weekly withdrawal that they were taking from his check to support the child from a previous relationship, and it was after I had gone through that and we had been successful in getting that reduction for him that I really became aware that he and Andrea looked like they were definitely headed for a divorce.

        And so on Tuesday of the week in which Andrea died on Friday, we were going to lunch together. … Stephen and I were alone riding in my vehicle headed for a restaurant called Cozy Cove, and I asked him if I should be looking for any mail and expecting any correspondence from the Department of Human Services regarding the upcoming divorce and withholding money for the three children, and he replied that no, I should not expect to hear from Human Services, because he and Andrea had worked out an arrangement between them and that he was going to pay her directly X number of dollars per week or per month to take care of the children and that he had told her if she contacted the Department of Human Services or contested this arrangement in any way that he would kill her.

Q.      He told you that that's what he told Andrea?

A.      Yes.

Q.      Okay.  Did – was he joking when he said that to you?

A.      Excuse me?

Q.      Was he joking when he said that to you?

A.      I certainly didn't take it as a joke, and there was no – there was no laughter in the car and there was no jocularity about it.

Q.       … You had an interview with Detective Pickering prior – right after the homicide occurred; is that correct?

A.      I did.

….

Q. Okay.  And in that interview, did you tell Detective Pickering that you didn't take this threat to kill Andrea literally?

A.      Exactly.

Q.      And would you explain to the members of the jury, please – you said it was serious but you didn't take it literally.  Could you explain that for us?

A.      I had never seen a violent side to Stephen Lockhart.  In my dealings with him and in all of the time that I had known him, and that we had worked together and whatnot, this statement was totally out of character for what I had – you know, what I had experienced in dealing with him, for the last year,  I – I took it – I took his statement somewhat seriously only because of – by reputation …

DEFENSE COUNSEL:        Objection, Your Honor.

THE COURT:        Yeah, I think that probably that's sustained.

Q.      It's fair to say you took some of it seriously but not literally, is that fair to say?

A.      Exactly.

Q.      You took it serious but not literally.

        The other thing I want to ask you is you have taught – you – in this interview you had with Detective Pickering, I – you had said that you had helped the defendant with a matter before – with regard to DHS a couple of weeks before Andrea died.  Did I understand that correctly?

A.  Yes.

Q. Okay.  Are you absolutely sure that the conversation with the defendant about the fact he would kill Andrea if she went to DHS occurred the Tuesday before the Friday of the homicide?

A.      Absolutely.

Q.      Why are you so sure about that?

A.      It was the first time that Stephen Lockhart had ever spoken an ugly word to me or said anything that could be the least bit construed to be violent or anything – it was totally out of character from the man that I knew.

Q.      Okay.  All right.  And what does that have to do with your being so positive that it happened on the Tuesday prior to the Friday?

A.      It was such a shocking statement that I not only can remember the date but I can tell you that we were driving by the Pemetic Elementary School when the statement was made.  You know it's – it was not something that was light and airy, and so it didn't – it didn't leave me, and then what happened subsequently reinforced that memory, I believe.

(Trial Tr. at 182-86.)

The Moore testimony became a very significant side-show of the trial.  Shortly following this testimony highlighted above, an objection by defense counsel triggered a side bar conference during which Lockhart's attorney explained that his objection was geared towards seeing "if there's any more unanticipated or unexpected testimony because quite frankly there was unfair surprise in a number of things that were testified to previously that are not contained in the statements that we were provided, and so I didn't know exactly what he was going to say, that's a concern."  (Id. at 189.)   It was defense counsel's argument that Moore was "testifying away from his statements."  (Id.)

Defense counsel, of course, cross-examined Moore on this area of his testimony.   Moore was rather squirmy over the accuracy of his memory directly after the crime relative to his

18

memory during the trial. (Id. at 233-37.) With regards to the DHS statement the cross-

examination went as follows:

> Q.      But surely you recall telling him on December 12th that when Steve made
> the statement if Andrea went to DHS he would kill her, you didn't take that
> literally then, did you?
> A.      I didn't take that literally, no, but I certainly took that – that with some
> concern.  It wasn't the type of thing that was in passing conversation or a joke or
> an answer to a riddle or anything else.  I was stunned by it.
> Q.      Okay.  Well let me see if we can look at the date when that might have
> happened.  Do you know precisely what day?
> A.      Tuesday.
> Q.      And what – Tuesday prior to?
> A.      Her death.
> Q.      December 11th?
> A.      Yes.
> Q.      And do you recall a discussion with Mr. Bruce Clukey of the Department
> of Human Services to discuss Stephen's child support obligation relating to
> Stephanie?
> A.      I didn't know the child's name.  Now that you said Mr. Clukey's name, I
> remember speaking to him, yes.
> Q.      And that was about 12 weeks before December 11, wasn't it?
> A.       I don't know that.
> Q.      Sometime before December 11, right?
> A.      It certainly was sometimes before December 11, yes.

(Id. at 238-39.)   There was a lengthy to-and-fro on the time of the call to Clukey, defense

counsel placing it in September -- about twelve-months prior to Andrea's death -- and Moore

insisting it was more like two weeks prior to the events.  (Id. at 239-40.)  Moore represented that

after he talked with Clukey he went into the shop to tell Moore that he had succeeded.  (Id. at

240.)  The cross-examination proceeded:

> Q.      And isn't it at this point in time, Mr. Moore, when Stephen then makes
> that statement?
> A.      No, sir.  The statement that I quoted he made on the Tuesday before
> Andrea died in my car on the main street of Southwest Harbor, right abreast of the
> Pemetic Elementary School on our way to Cozy Cove Restaurant for lunch.
> Q.      And relating to that statement, you did tell Detective Pickering that you
> hadn't seen any incidents or behavior from Stephen that would lead you to believe
> that he was serious about that statement, correct?

> A.     That is exactly accurate.  He asked me if I had seen any violent behavior and I said no.
> Q.     And you said in your testimony here today that that was such a shocking statement, that that really set you back?
> A.     Absolutely.

(Id. at 240-41.)  Counsel then made it clear that Moore did not contact the police, Andrea

Lockhart, or anyone else, despite his characterization of the statement as shocking.  (Id. at 241-

42.)  Moore elaborated:  "And the reason that it's very easy to remember the statement when it

was made was because [it] was made on a Tuesday and she died the following Friday.  The

proximity of the two things helped – helped the memory function a great deal."  (Id. at 241.)

Defense counsel also elicited that Moore "would not be surprised" if he had told Detective

Pickering at the time "that he couldn't believe how this had happened" because Moore "was as

shocked as anybody." (Id. at243-44.)

    After Moore's testimony, the defense team learned that Moore had discussed portions of

the case presented outside his hearing, possibly in violation of the sequestration order.   There

was evidence of Moore's animosity towards Lockhart and defense counsel.   In pursuit of this

vulnerability in the State's case, defense counsel secured a mid-trial voir dire of Moore and

Detective Pickering.  (See Trial Tr. at 559-622.)   Defense counsel cross-examined Detective

Pickering on the statements made to Pickering by Moore:

> Q.     Okay.  Now, the point about whatever time or date it was that Mr. Lockhart may have said to Mr. Moore something about DHS and if Andrea goes there he'll kill her, do you remember that?
> A.     Correct.
> Q.     Speaking about that with him.
> A.     Correct.
> Q.     Okay.  Looking again at your summary of the interview with Lewis Moore
> …
> ….
> …The third sentence.  It begins Moore stated, right?  And that says Moore stated a couple of weeks ago., right?
> ….

A.       Okay, yes, Moore stated a couple weeks ago.

Q.       A couple of weeks ago.  And then you go on to describe the DHS incident, withholding of child support, correct?

A.       Correct.

Q.       And then you go on, and that's when you record that Moore stated that Stephen made the statement that he would kill Andrea about child support, right?

A.       Correct.

Q.       Moore never told you it was on the Tuesday before this Friday, did he?

A.       He did not.

Q.       And that's clear to you, isn't it?

A.       Yes.

Q.       Moore also told you that he didn't take that statement literally, didn't he?

A.       Yes.

Q.       Moore also told you he had seen no incidents of behavior from Stephen that would lead him to believe that he was serious with that statement, correct?

A.       Correct.

Q.       And Moore never told you that he was shocked with that statement, correct?

A.       Correct.

Q.       And if Moore had told you that, that would have been important to this investigation, correct?

A.       I probably would have questioned him further.

Q.       Moore never told you that this was out of character for Stephen, correct?

A.       Correct.

Q.       And Moore never told you anything about driving with Stephen by the Pemetic School, did he?

A.       He did not.

Q.        And he never told you anything about driving to the Cozy Corner Cove restaurant in Southwest Harbor, correct?

A.       He did not.

Q.       He never told you about having lunch with Stephen at the Cozy Cove, right?

A.       He did not.

(Trial Tr. at 747-49.)

Moore was recalled by the defense during its case as a hostile witness.  Counsel

essentially began with the query, "Did you understand on Tuesday of this week, in this serious

trial, that this Court and that this defendant rely on your ability to testify fairly and accurately?"

(Trial Tr. at 852.)  And, Lockhart's attorney continued, on the day you testified, "you were

careless with the truth" to which Moore responded, "Yes."  (Id. at 853.)  Defense counsel then

21

laid out the facts unearthed by the defense team since Moore's testimony for the prosecution that

Moore's cousin, William Connery died in December and Moore attended the funeral at 11:00

a.m. on Tuesday, December 8 and then had lunch at the Hilltop Restaurant in Ellsworth, Maine.

(Id. at 853-55.)  Defense counsel then impeached as follows:

> Q.      Your testimony on Tuesday, you discussed a conversation between you and Mr. Lockhart while riding in your car, right?
> A.      Yes, sir.
> Q.      And you told the jury that you and Mr. Lockhart were riding alone in your car on that Tuesday, correct.
> A.      Yes, sir.
> Q.      And you said under oath that Stephen told you that he told Andrea if she contacted DHS or contested the arrangement in any way that he would kill her, right.
> A.      Yes, sir.
> Q.      And under direct examination [the prosecutor] asked you if he was joking, right?
> A.      I'm sorry, but I don't recall that, you can refresh my memory?
> Q.      And you recalled – you responded to her question that there was no laughter in the car, didn't you?
> A.      Yes, sir, I do remember that.
> Q.       And then you said, and there was no jocularity about it, didn't you?
> A.      Yes, sir.
> Q.       Your word, jocularity, right?
> A.      I used that word.
> Q.      Do you recall her question, quote, are you absolutely sure that the conversation with defendant about the fact he would kill Andrea if she went to DHS occurred the Tuesday before the Friday of the homicide, do you recall that question?
> A.      I do not, but if it's in the record, I will gladly take your word for it.
> ….
> …
> Q.      Do you remember telling the jury that you were so sure because Stephen had never spoken an ugly word and that was totally out of character?
> A.      That was in a description of the statement as opposed to the date, and I stand by that comment.  I was incorrect on the date.
> Q.      Do you recall [the prosecutor] then saying to you, and what does that have to do with your being so positive that it happened on the Tuesday prior to the Friday, do you remember her asking you why you were so positive about that?
> A.      No, sir, I can't say that I do.
> Q.      Do you remember responding to a question similar to that with the answer, I know for certain that's [] because at the time we were driving by the Pemetic School, do you remember saying that, the Pemetic Elementary School?

A.     Yes.

Q.     Do you remember telling her that your ride was going from – by the Pemetic Elementary School to the Cozy Cove Restaurant in Southwest Harbour?

A.     Yes, sir.

Q.     Do you remember … testifying about the DHS conversation you had with Bruce Clukey?

….

A.     Yes, sir.

Q.     And I asked you if that was the point in time when Stephen made that statement, didn't I?

A.     I believe you did.

Q.     And I said, quote, and isn't it at that point in time, Mr. Moore, when Stephen makes this statement, do you remember that question?

A.     I don't remember it specifically sir, but –

Q.     And do you recall this answer, no, sir, the statement that I quoted he made on the Tuesday before Andrea died in my car on Main Street in Southwest Harbor right abreast of the Pemetic elementary school on our way to the Cozy Cove Restaurant for lunch, correct?

A.     Yes, sir.

Q.     In fact you didn't eat lunch at the Cozy Cove that day, did you?

A.     No, sir.

Q.     And Mr. Lockhart didn't make that statement to you on that day, did he?

A.     No sir.

Q.     And our investigator went to see you on Wednesday night, correct…?

A.     Yes, sir.

Q.     And he tried to serve a subpoena on you to come back after that was discovered, that you were at a funeral that day, right?

A.     He tried to serve a subpoena on me, yes, sir.

Q.     And you told him… with some profane language that you weren't coming back to this trial, correct?

A.     I told him that I had been excused by both the defense and by the prosecution and that I felt that it would take an officer of the Court to serve me with the paper, to the best of my knowledge, to have to reappear here in this courtroom.

Q.     Well, you told him it would take the Maine State Police to get you back to court, didn't you?

A.     I – yes, I probably did.

Q.     And you were yelling during that discussion, right?

A.     It was – I was very agitated at the time, yes, sir.

Q.     And you had some choice profane words for Mr. Lockhart, didn't you?

A.     For Mr. Lockhart?

Q.     We're not talking about anybody else.  Did you swear about Mr. Lockhart, call him something?

A.     Did I call him something?

Q.     Yup.

A.     The first profanity that I used –

> Q.      I'm asking – excuse me, sir, if I may.  Did you – do you recall using any profanity in referring to Mr. Lockhart, in speaking with that investigator?  Two days ago?
> A.      Yes.
> Q.      You also told that investigator that Mr. Lockhart had ruined, I won't say the explicative, a ski vacation or something for you, right?
> A.       I -- I don't remember telling the investigator that.  But by your own description, the conversation was a bit heated at that point and I – I can't honestly swear to that, sir.
> Q.      Okay.  The conversation was heated, it was between you and Mr. Buchanan, right?
> A.      Yes, sir.
> Q.      But he wasn't heated with you, was he, at all?
> A.      No, he was – I can't – I'm not sure of the right description.  He did not identify himself as an officer of the Court so I felt as if he was someone that I did not need to be speaking to and that this was a continuation of harassment that had gone on for almost three years.
> Q.      And you told him that Stephen Lockhart had cost you $1500, didn't you?
> A.       I don't remember that exactly.
> Q.      Do you remember saying the figure of $1500.
> A.      Not to that gentleman.  But there is a $1500 matter, yes.

(Trial Tr. at 856- 63.)  On cross-examination the prosecutor explored with Moore that even if he got the date wrong, he was confident that the conversation took place abreast the Pemetic Elementary School and that the fact that the statement was made was more important to Moore than when it was made.  (Id. at 864-66.)

In his closing statement, defense counsel highlighted that Moore had testified that what Moore reports Lockhart as saying was "totally out of character," adding "I don't suggest that so you believe Lewis Moore, because I will suggest you shouldn't."  (Closing Argument Tr. at 38.) With respect to Moore's characterization of the conversation, defense counsel summarized:

> The testimony in September, just after the split, is important for one very important reason.  You heard in this case from Lewis Moore, unfortunately we had to hear from him twice, because the first time, when he raised his right hand, he swore to tell the truth.  We got him back here two days later, after the investigator uncovered he was at a funeral when  he says he was down in Southwest Harbor with Stephen, when he was eating at the [H]illtop [R]estaurant in truth in Ellsworth, when he testified under oath, took that stand and raised his right hand and tried to get you to believe that he was eating lunch that day at the

24

Cozy Cove restaurant, that's important, because as I suggested to him, the conversation took place in September.

The conversation took place when he was calling DHS for Stephen about … getting the – withholdings lowered on his child support because it had been done back in July sometime, reduced from 80 to 55, do you remember that testimony?  And that in fact he didn't need to be withholding that much, but he needed to get it from the authority of the Department [o]f Human Services that he could reduce the obligation.  And doesn't it make sense that it would be at that time that Lewis Moore makes the comment, because Andrea has just left and gone to Lamoine, they have separated, and he says now we've got that one straightened out  …I hope Andrea  -- or we don't have to go through this with Andrea, or is Andrea going to go to the Department of Human Services and we're going to have to do the same thing again?  And Stephen makes the off collar, inappropriate remark, not to be taken seriously, God, if she goes to DHS I'd kill her.

And if he was trying to suggest a certain course of events to you, he would have denied that statement all together here. But he testified truthfully, I made that statement, and it was in September and it was at that time.  And I would suggest to you, as angry as Lewis Moore is and as angry as he is at Stephen for causing perhaps the loss of his boat yard and a loss of a partnership of the Finishing Touch … that he would do anything for revenge.

(Id. at 46-48.)   After summarizing some of Moore's definitive statements on direct examination

vis-à-vis when and where this conversation occurred, defense counsel opined:

[Moore] told you under oath he was absolutely sure this conversation happened on that day.  And now he expects you to believe that, well it happened, but I'm just – it was that week, I'm just not sure which day it was.  He said absolutely and he said it under oath.

[Moore testified] it was such a shocking statement that I not only can remember the date, but I can tell you that we were driving by the Pemetic Elementary School when the statement was made….Well, he was wrong about that.  And don't you just question that he may have been wrong about when the conversation was with Bruce Clukey that led to Stephen making that stupid off collar response that they want [] you to rely on as one of the myriad of theories that the state presents in this case.

(Id. at 55.)

The prosecutor honed in on this rebuff of Moore's veracity in her rebuttal. She stressed:

The defendant is making a huge issue of Lewis Moore.  Lewis Moore is mistaken about this, he is mistaken about that, he's this, he's that.   Why is that so important?  Because if you go back to the jury room and you find that … Lewis Moore was mistaken about a date, does that somehow make this man not guilty of murder?  Absolutely not.

25

What it is – don't forget, ladies and gentlemen, this defendant himself said he made the statement.  This is an uncontested statement.  And why is it so damaging to them?  Why did [defense counsel] just spend a good 15 to 20 minutes trying to discredit Lewis Moore?  Because it was a self-fulfilling prophecy that blows their manslaughter theory all to heck.  If she goes to DHS, I'll kill her.  She went to DHS, he killed her.  It is a self-fulfilling prophecy and it just blows the heck out of any sort of manslaughter suggestion.

(Id. at 71-72.)

At the post conviction hearing post-conviction counsel explored apropos the prospect of

calling Bruce Clukey:

Q.  …And with respect to Bruce Clukey, I understand that you really didn't check with him, I know the whole issue with Lewis Moore became a big event, I know that he had to be impeached and was, do you agree or disagree that the date on when that statement was attributed to Steve, if –oh, God, if she goes to DHS I'll kill her, that when that was made in relation to the killing was an important issue  in the case.
A.      No.
Q.      You don't think it was important?
A.      No.
Q.      Okay.
A       I don't think Bruce Clukey…. I don't think that he added or sealed that deal for us on that issue, because it's a statement not in the presence of Bruce Clukey, it's a statement made by Steve Lockhart.  So Bruce Clukey has no knowledge of when Steve made that statement to – to Lewis Moore.  Steve testifies different than Lewis testifies and we proved that Lewis was mistaken on his dates and it was earlier because of that funeral.

(Post Conviction Tr. at 701.) Trial counsel conceded that he did not attempt to establish through

Moore when he and Lockhart actually had this conversation.  (Id. at 819-21.)  The record

indicates that this conversation between Clukey and Moore occurred on October 13, 1998.

(Mem. Support Issuance Certificate Probable Cause at 17.)

In a footnote of the post-conviction court's order the judge observed vis-à-vis Clukey and

the ineffective assistance inquiry:

In his petition for post conviction review, Lockhart faults his trial counsel for not establishing exactly when Lewis Moore had talked to DHS support enforcement officer Bruce Clukey about lowering his support obligation for his older daughter

Stephanie.  See Ground Eleven of Petition and Petitioner's Ex.F.  There are two problems with this.  First, while there was a dispute as to when this conversation took place (Lockhart testified that it took place in med-September, Moore thought it had taken place much closer to December, and Clukey's notes establish that it took place on October 13), that was not a major issue.  The real dispute concerned the date when Lockhart had stated, either jokingly or more seriously, that he would kill Andrea if she went to DHS.  Lockhart testified that this statement had been made at the time of the Clukey conversation, but Lewis Moore disagreed.  (Trial Tr. 866.)  Pinpointing the date of the Clukey conversation, therefore, would not have resolved the more important issue of when Lockhart had made the "I'll kill her" remark.

Second, and just as significantly, Lewis Moore had been impeached very effectively by [defense counsel] at trial.  See, e.g., Trial Tr. 853 (acknowledgment by Moore that he had been "careless with the truth").  As previously noted, there was no dispute that the statement was made.  At the end of the trial, therefore, the State argued that if Moore was mistaken as to the date, the statement was still important whenever it was made.  Closing Argument Tr. 71.  At that point, the jury had the opportunity to hear Lockhart testify, and the date of the Clukey conversation was insignificant.  Failing to call Clukey was neither ineffective nor is there any reasonable probability it would have affected the outcome of trial.

(Post-conviction Order at 24 n.20.)

As with the § 2254 attack on counsel's performance with respect to not calling Somers, Lockhart has not demonstrated the post-conviction court's conclusion that there was no performance shortfall or prejudice in not calling Clukey is an unreasonable application of Strickland.  Calling Clukey to testify about the timing of his conversation with Moore would have provided more concrete information than that promised by calling Somers.  However,  it would not have advanced the defense case unless there was some evidence -- beyond Lockhart's own testimony -- to elicit from Moore a more defense-friendly timeframe for the "oh, God, if she goes to DHS I'll kill her" remark.  There is no question that defense counsel effectively impeached Moore with respect to his insistence that the remark was made on the Tuesday before Andrea's death.  There is little doubt that this point was driven home to the jury.  However, as the post-conviction court pointed out, establishing the date of the Clukey/Moore phone call

27

would not have made nearly enough difference in view of the other evidence -- including

Lockhart's own testimony -- supporting the jury's intentional murder verdict.

### D.  Failure to Properly Prepare for and Cross-Examine State Witness Mary Kief (Andrea's Sister)

Lockhart's fourth challenge to his attorney's performance focuses on his efforts vis-à-vis

the trial testimony of prosecution witness, Mary Kief, Andrea's sister.  The trial transcript

reveals that, in the context of motions in limine seeking to limit her testimony, the cross-

examination of Kief is problematic.

In his 28 U.S.C. § 2254 memorandum, Lockhart explains that his two trial attorneys filed

separate motions in limine to exclude Kief's testimony apropos a 1992 'prior bad act' involving

Lockhart's former girlfriend that arose with regards to a disagreement of Lockhart's child

support obligations for Lockhart's eldest daughter.  Apparently while Lockhart was intoxicated

he called Andrea and threatened to commit suicide in front of his daughter's mother.   With

respect to that episode, Andrea called Mary Kief to help locate Lockhart and shortly after

Lockhart arrived at Kief's home.  As a consequence of this interchange Andrea and Kief had

Lockhart admitted to inpatient care for thirty days.  (See. Sec. 2254 Mem. at 106, Doc. No. 1-6 at

1.)

The key part of the transcript of defense counsel's cross examination of Kief is as

follows:

> Q.     In all the time that you couples were close together, that was never
> anything you had witnessed, correct, him physically striking Andrea?
> A.     Right.
> Q.     And when you say he sounded fine on the phone and you went down to
> talk to him, he sounded fine, you had never obviously encountered  any kind of
> situation – what you learned after the fact, encountered any kind of situation like
> this before, correct?
> A.     Can you restate that?
> Q.     Obviously you had never encountered Stephen in such a situation.

A.      Such a situation as what?
Q.      As what we know now to have happened before, that he had killed
Andrea.
A.      Yes, I have.
Q.       No, that he had killed Andrea, you had never seen him in that  --- such a
situation?
A.      I have seen him –
Q.      I am asking about his appearance after such a situation.  Did you ever see
him in such a condition after killing someone?
A.      Yes, I have.
Q.      After killing someone?
A.      No, after attempting to kill someone.

(Trial Tr. at 115-16.)  Apparently recognizing his misstep, defense counsel then abruptly

changed topics.  Lockhart argues that the cross-examining attorney was never asked at the post-

conviction hearing about the motion in limine or how he failed to remember this sensitive issue

during his cross-examination of Andrea's sister.  (Sec. 2254 Mem. at 108, Doc. No. 1-6 at 3.)

The post-conviction court did express some concern about counsel's efforts on this front.

The justice explained:

> This question was ill advised, but the court notes that the standard for
> ineffectiveness of counsel is not perfection but rather there was a serious
> incompetence amounting to performance below what might be expected for an
> ordinary fallible attorney.  This does not mean an attorney who is prone to errors
> but it does mean an attorney who is not perfect.  There is almost certainly no
> experienced attorney who has not at some point posed a question in cross-
> examination … that in retrospect was ill advised and that elicited a damaging
> answer. Lockhart's trial counsel did not fall beneath the required standard of
> performance in this instance, and in the totality of the trial Kief's answer was not
> something that likely affected the jury's verdict, particularly as it was not clear to
> what she was referring.

(Post-conviction Order at 29-30.)

Lockhart insists that the post-conviction court should not have applied the 'in hindsight'

or 'in retrospect' analysis.  (Sec. 2254 Mem. at 108, Doc. No. 1-6 at 3.) He highlights the

testimony of counsel at the post-conviction proceeding in which his attorney admitted that "in

hindsight with full knowledge" of the context of this testimony he would not have asked this

question or would have asked it in a different way to avoid this type of answer.  (Post-Conviction

Hr'g Tr. at 795.)  However, the post-conviction court's deferential approach to the concern

raised by counsel's questioning of Kief is entirely in line with the Sixth Amendment standard.

See Wiggins v. Smith, 539 U.S. 510, 523 (2003) ( "[W]e must conduct an objective review of

their performance, measured for "reasonableness under prevailing professional norms,"

Strickland, 466 U.S., at 688, which includes a context-dependent consideration of the challenged

conduct as seen "from counsel's perspective at the time," id., at 689 ('[E]very effort [must] be

made to eliminate the distorting effects of hindsight')."); Bell v. Cone, 535 U.S. 685, 702 (2002)

("We cautioned in Strickland that a court must indulge a "strong presumption" that counsel's

conduct falls within the wide range of reasonable professional assistance because it is all too

easy to conclude that a particular act or omission of counsel was unreasonable in the harsh light

of hindsight. 466 U.S., at 689. Given the choices available to respondent's counsel and the

reasons we have identified, we cannot say that the state court's application of *Strickland's*

attorney-performance standard was objectively unreasonable.").   Trial counsel made a mistake

in pursuing this line of questioning. However, the post-conviction court's conclusion that there

was no measurable prejudice given the ambiguity of Kief's response, is not an unreasonable

application of the Strickland prejudice prong.  See United States v. Gonzalez-Lopez, 548 U.S.

140, 147 (2006) (The requirement that a defendant show prejudice in effective representation

cases arises from the very nature of the specific element of the right to counsel at issue there-

*effective* (not mistake-free) representation. Counsel cannot be "ineffective" unless his mistakes

have harmed the defense (or, at least, unless it is reasonably likely that they have). Thus, a

violation of the Sixth Amendment right to *effective* representation is not "complete" until the

defendant is prejudiced.").

Lockhart's further emphasis here is that post-conviction counsel should have confronted trial counsel on this slip and presented evidence of Kief's original police statement. (Sec. 2254 Mem. at 109, Doc. No. 1-6 at 4.) However: "The ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254." 28 U.S.C. § 2254(i).

### E.  Failure to Object to Jury Instruction

As for Lockhart's final ineffective assistant plaint, it is his belief that his attorney should have objected to the court's jury instructions. The Maine Law Court described Lockhart's parallel state court challenge as follows:

> The court included in its spoken jury instructions an explanation of the State's burden of proof beyond a reasonable doubt. The court also provided the jury written instructions repeating the court's verbal instructions regarding the elements of murder and manslaughter, and how the elements of knowledge and intent may be inferred. The written instructions did not repeat the court's verbal instruction regarding the State's burden of proof beyond a reasonable doubt. Lockhart did not object to the absence of an explanation of the State's burden of proof beyond a reasonable doubt in the proposed written instructions discussed by counsel with the court in chambers, after the closing statements, or after the oral instructions were delivered.

Lockhart, 2003 ME 108, ¶ 13, 830 A.2d at 441.

Vis-à-vis Lockhart's claim, the Maine Law Court ruled:

> Lockhart contends that because the court's written jury instructions included an explanation of how to infer "intentional and knowing conduct" but failed to restate the "State's burden of proof beyond a reasonable doubt," the written instructions unfairly emphasized the duty of the jury to infer the presence of intentional or knowing conduct from surrounding circumstances, with the consequence of prejudicially favoring the State over the defendant. The State responds that because Lockhart did not object to the instructions before they were delivered to the jury, he waived any objection and should be barred from raising this issue on appeal.
> The court may choose to "provide written instructions to the jury covering all or a part of what is orally provided." M.R.Crim. P. 30(b). "Before written instructions are provided to the jury, the parties should be given the opportunity to

31

review the instructions, suggest alterations, object to the language of the instructions, and, if necessary, preserve those objections." State v. Knox, 2003 ME 39, ¶ 6, 819 A.2d 1011, 1013. Here, defense counsel did not object to the absence of an explanation of the State's proof beyond a reasonable doubt in the proposed written instructions when they were discussed by counsel and the judge in chambers, after closing arguments, and after the oral instructions were delivered. Because Lockhart failed to object to the instructions, they are reviewed for obvious error. There is no obvious error because the spoken instructions correctly explained the jury's task with respect to the State's proof beyond a reasonable doubt. Considering the spoken and written instructions as a whole, the trial court did not err by failing to repeat its spoken reasonable doubt instruction in its written instructions.

Lockhart, 2003 ME 108, ¶¶ 43-44, 830 A.2d at 448 (footnote omitted). The Court added:

"While we discern no obvious error, consideration should be given to including a reasonable doubt instruction in any written instruction that includes an inference instruction because of the primacy of the reasonable doubt standard in criminal proceedings." 2003 ME 108, ¶ 44 n.4, 830 A.2d at 448 n.4.

The post-conviction court made an oral ruling on this claim as it was reconfigured in the post-conviction context, explaining,

first, the petitioner cannot show prejudice, second, … if you look at the instruction, the instruction refers to reasonable doubt a number of times, it says the state has to prove he acted intentionally or knowingly beyond a reasonable doubt several times, and in – in particular it says it both before and after the portion of the instructions you're referring to. So I – it's very hard for me to make any kind of presumption that the jury didn't understand that they had to find intent beyond a reasonable doubt even if it was inferred. But also on the ground that since that instruction comes from Judge Alexander's jury instructions, I don't think it could be suggested that a reasonable counsel should have objected to that or that it somehow fell below the standard to be expected of an ordinary fallible counsel not to have objected to the inferred instruction, where that was an instruction in – at the time in Maine's guiding treatise on jury instructions, and which by the way remains today in almost identical if not identical fashion in the treatise.
    So I can't see that – that that would make it – that ground 20 would make it on either count, that a reasonable attorney should have objected to the use of the – of the treatise instruction, or that where that treatise instruction was surrounded by instructions requiring that intent be proven beyond a reasonable doubt, that the

jury could possibly be presumed to have not understood reasonable doubt under those circumstances.

(Post-Conviction Tr. at 940—41.) [7]

It is obvious from the post-conviction justice's discussion of this Sixth Amendment claim that trial counsel would not have met with success had he objected to the instruction the justice gave at trial. The Maine Law Court's conclusion that the instructions themselves withstand scrutiny on direct appeal further highlights, not only the futility had counsel objected, but also a lack of Strickland prejudice.

### *Summary*

In sum, I have fully considered the various shortfalls identified by Lockhart and I conclude that "the assumed deficiencies" do not present "'a reasonable probability that,' but for the [deficiencies], 'the result of the proceeding would have been different.'" Spisak, 130 S. Ct. at 687 (citing Strickland, 466 U.S., at 694.) Having reviewed the transcript of the post-conviction evidentiary hearing, I could identify no 28 U.S.C. § 2254(d)(2) shortfall. I therefore cannot find the Superior Court's decision rejecting Lockhart's "ineffective-assistance-of-counsel claim to be an 'unreasonable application' of the law 'clearly established' in Strickland." Id. ( citing 28 U.S.C. § 2254(d)(1)).

---

[7]     This is the ground as to which there is some dispute as to whether or not Lockhart can present a certain aspect of this claim in this § 2254 petition given the exhaustion requirement. The State argues that in presenting this ground in his memorandum, "Lockhart appears to be raising for the first time an allegation of prosecutorial misconduct in opening statement and closing argument for suggesting to the jury that Lockhart's conduct was premeditated while conceding at sentencing that it was not. Lockhart did not raise this claim on direct appeal [or] in his state postconviction review, thus he cannot raise it in the first instance in this Court." (Resp. Sec. 2254 Pet. at 9 n. 3.) In his § 2254 reply memorandum Lockhart insists that "prosecutorial misconduct and misrepresentation of facts is something that has been raised throughout this case." (Reply Mem. at 5.) The Maine Law Court did address some of Lockhart's claims concerning prosecutorial misconduct, Lockhart, 2003 ME 108, ¶¶47-49; 830 A.2d at 449, but there is no alignment between those claims and the ones suggested in Lockhart's § 2254 pleadings.

*Conclusion*

For the reasons stated above, I recommend that the Court deny Lockhart 28 U.S.C.

§ 2254 relief.  I further recommend that a certificate of appealability should not issue in the event

Lockhart files a notice of appeal because there is no substantial showing of the denial of a

constitutional right within the meaning of 28 U.S.C. § 2253(c)(2).

NOTICE

A party may file objections to those specified portions of a magistrate
judge's report or proposed findings or recommended decisions entered pursuant to
28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought,
together with a supporting memorandum, within fourteen (14) days of being
served with a copy thereof.  A responsive memorandum shall be filed within
fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de
novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

February 19, 2010.